# PINELLAS COUNTY, etc., et al. v MARTIN, et al.

Case No. 82-13019-17

Sixth Judicial Circuit, Pinellas County

November 24, 1986

## APPEARANCES OF COUNSEL

**John T. Allen, Jr.** and **Christopher P. Jayson, John T. Allen, Jr., P.A.,** for plaintiffs.

**Michael J. Keane** for plaintiffs.
**John W. Berry** for defendants.
**Richard T. Earle, Jr.** for defendants.
**Joseph P. McNulty** for defendants.

## OPINION OF THE COURT

FRED L. BRYSON, Circuit Judge.

THIS CAUSE is before the Court for determination upon plaintiffs' Third Amended Complaint for Trespass, Public and Private Nuisance, Negligence, and for Injunctive Relief, and the Answer and Counterclaim for Damages of the defendants, James F. Martin, W. H. Martin and Ruby Martin, his wife, and C. H. Martin and Linda Martin, his wife, and various Motions for Contempt. After a month long trial in which this Court sat as the trier of fact from October 20, 1986, to November 15, 1986, the Court has heard many witnesses produced by both the plaintiffs and the defendants, has examined several hundred items of documentary evidence, on one occasion has viewed the borrow pits in question, and has personally observed the removal process of the Bobby Martin or Tyler Road Borrow Pits. The Court has also examined a vast quantity of chemical reports, data summaries, and has heard the testimony of numerous experts in the fields of geology, hydrogeology, pollution control and landfill removal, toxicology, engineering, and other environmental specialties which encompass the entire gamut of the contents, effect, pollution and potential pollution, and public harm which constitutes the essence of the issues before the Court. The Court, sitting as the trier of fact, has carefully weighed all of the evidence in this cause, considered the various local, state, and pollution control laws placed before it, and has weighed the credibility of all of the witnesses who have testified before the Court. The Court has carefully considered, reviewed and weighed the testimony of the expert witnesses presented by both parties in rendering its decision in this cause. The Court has determined that based upon the independent evidence placed before it at final hearing, and even exclusive of the testimony heard at the mandatory injunction hearing in this cause by the Honorable David Seth Walker, Circuit Judge, that the evidence requires the Court to find for the plaintiffs, Pinellas County, and H. George Wilde and Marjorie E. Wilde, and against the defendants.

## I. *BACKGROUND FACTS AND ISSUES TO BE DETERMINED*

This case commenced in October of 1982 with the filing of a Complaint by the plaintiffs based upon common law public and private nuisance, negligence, and injunctive relief. The complaint sought to

10

require the excavation of pollution material from two borrow pits which lie next to and approximately one-half to three-quarters of a mile to the east of the plaintiff, Pinellas County's Eldridge-Wilde Wellfield which it leases on a 99-year lease basis from plaintiffs, H. George Wilde and Marjorie E. Wilde, his wife.

On December 29, 1982, a hearing was held on plaintiff, Pinellas County's Motion for Temporary Mandatory Injunction for removal of the pollution material from the area known as the "Bobby Martin Borrow Pit." At the hearing, the defendants, James F. Martin and Patricia Martin, stipulated to the entry of an order requiring the pollution's removal by April 15, 1983. A similar order entered by the Hillsborough County Environmental Protection Commission (hereinafter referred to as HEPC), was made a part of the Circuit Court's order specifying the conditions of removal.

Thereafter, numerous continuances were sought and obtained postponing the date upon which the pollution was required to be removed from the Bobby Martin Borrow Pit. Notwithstanding the extensions of time, James F. Martin failed to timely remove the fill material and ultimately this Court entered an order holding the defendant, James F. Martin, in civil contempt and requiring his incarceration until the Bobby Martin Borrow Pit pollution "in gross" was removed.

Following the "in gross" removal under the Court's order, Pinellas County's tests showed that the pollution material remained in the floor of the Bobby Martin Borrow Pit in the form of leachate from the organics and inorganics that had been buried in the pit. The tests showed the existence of mercury and arsenic and other pollutants most notable of which was thalium. This pollution had not been removed at the time of the final hearing in this cause.

Pinellas County also filed a Second Amended Complaint alleging that an area two to three hundred yards from the Bobby Martin Borrow Pit, known as "Cell IV," had also been filled with pollution, was a danger to the wellfield, and required excavation and removal. A hearing on a Motion for Temporary Mandatory Injunction as to Cell IV and the removal of the remaining pollution material in the bottom of the Bobby Martin Borrow Pit was held on February 19 through 22, 1985, resulting in the defendants, James F. Martin and Patricia Martin, stipulating to the entry of a "Consent Mandatory Injunction" entered by the Court on February 27, 1985. That order required the removal of all pollution material in the Bobby Martin Borrow Pit, Cell IV, and an area known as the "storage area" on or before April 27, 1985. Ultimately the Court held Bobby Martin in civil contempt for failure

11

to comply with the Consent Mandatory Injunction. The Court imposed a 30 day jail sentence, which was purgeable upon removal of the pollution material. The defendant, James F. "Bobby" Martin, appealed this Court's judgment of contempt which was later affirmed by the Second District Court of Appeal of the State of Florida without opinion on July 23, 1986. *See Martin v. Pinellas County,* 493 So.2d 459 (Fla. 2d DCA 1986).

This Court also heard plaintiff, Pinellas County's motion to restrain the defendant, James F. Martin, from excavating clean dirt in the area known as the "storage area" and to commence removal operations in the Cell IV area. The Court, on July 9, 1986, granted this motion ordering the defendant, James F. Martin, to cease and desist from mining the area known as the "storage area" and ordering the defendant to complete the pollution material removal of Cell IV on or before August 25, 1986. The Court has before it Motions for Contempt of this Court's two orders seeking the imposition of civil contempt against James F. "Bobby" Martin for failure to remove pollution from the entire area of the Bobby Martin Borrow Pit and comply with this Court's orders which are to be resolved on the evidence heard at final hearing.

At the time that James F. Martin appealed his contempt order imposing the 30 day sentence, this Court found that James F. "Bobby" Martin could have removed the pollution material from his borrow pit area and the storage area and Cell IV within the time permitted by the Court. The Court declined to stay its contempt order. The District Court, however, granted a stay and required that a supersedeas bond be posted. The Court permitted the filing of a "Personal Undertaking" signed by the defendants, James F. Martin and Patricia Martin, his wife, without the necessity of the signature of a good and sufficient surety as defined under the Florida Appellate Rules. The intent of the Court was to accept all personal assets of the defendants, James F. Martin and Patricia Martin, as security for the stay of proceedings. The legal effect was the waiver of all claims for exemption by the defendants including homestead. The defendants filed such a "Personal Undertaking" with this Court after which the judgment of this Court was affirmed. The Court must assess an amount of money which may be collected against the "Personal Undertaking." These monies arise from damages experienced by the plaintiff, Pinellas County, as the result of the delay in enforcement of this Court's order requiring the removal of the pollution material from the Bobby Martin Borrow Pit area and Cell IV.

Upon affirmance by the District Court of the Order of Contempt on

the Consent Mandatory Injunction, this Court entered an order refusing to stay the imposition of the thirty day jail sentence and ordered the commitment of the defendant, James F. Martin, to commence on September 30, 1986. The Court later, upon motion of the defendant, temporarily stayed the serving of the remainder of the defendant's sentence to permit James F. Martin to prepare for and to be present at the trial of this cause. The question of whether or not to require the defendant to further serve the remainder of the sentence and to determine whether or not the defendant, James F. Martin, should be held in civil contempt for failure to comply with the original Court's order of December 29, 1982, requiring pollution material removal of the Bobby Martin Borrow Pit, this Court's Consent Mandatory Injunction, and order requiring Cell IV removal, is thus also before the Court upon final hearing for determination.

On June 15, 1983, the Honorable David Seth Walker, Circuit Judge, heard plaintiff, Pinellas County's Motion for Emergency Mandatory Injunction requesting the Court to order the defendants, W. H. Martin and C. H. Martin, to remove the fill material and pollution material from the area known as the Charlie Martin Borrow Pit or Tyler Road Borrow Pit. The Court entered an order requiring the defendants to remove the pollution material. The defendants appealed this decision to the Second District Court of Appeal which was affirmed by opinion on December 15, 1983. *See Martin v. Pinellas County*, 444 So.2d 439 (Fla. 2d DCA 1982), *cert. den.*, 451 So.2d 849, (Fla. 1984).

Thereafter, the defendants, W. H. Martin and C. H. Martin, made an inadequate attempt at complying with the Court's order of removal, and ultimately, the defendants in open Court refused to comply with the Court's order. The Court found the defendants in contempt of Court, subject to fine and penalties to be later determined, and ordered the plaintiff, Pinellas County, to commence removal of the pollution material found in the Charlie Martin Borrow Pit. This Court entered its order requiring the plaintiff, Pinellas County, to remove the pollution material on February 15, 1984. Various contempt motions and sentences arose from the apparent refusal of the defendants to permit Pinellas County to enter upon the Martin property to commence the pollution material removal process. These contempts were resolved in two separate decisions with the result that this Court's sentence of W. H. Martin and C. H. Martin to five days for contempt was affirmed. *See, Martin v. Pinellas County*, 483 So.2d 445 (Fla. 2d DCA 1986), and *Garcia v. Pinellas County*, 483 So.2d 443 (Fla. 2d DCA 1986). The Court has for determination on final judgment as to whether or not to sign a Warrant of Commitment requiring the defendants, W. H.

**13**

Martin and C. H. Martin, to serve the five day sentence affirmed by the District Court.

Pinellas County then proceeded to remove the pollution material from the area known as the Charlie Martin Borrow Pit between the dates of August 16, 1985, and June 14, 1986. Pinellas County removed approximately 201,000 cubic yards of material, a portion of which was disposed of as a "hazardous waste" under federal law at a hazardous waste facility in Pinewood, South Carolina. The remainder was disposed of at the Struthers Landfill in Pinellas County, Florida. All disposal sites were selected at the direction of the Department of Environmental Regulation of the State of Florida.

The plaintiff, Pinellas County, and plaintiffs, H. George Wilde and Marjorie E. Wilde, his wife, claim that the defendants, James F. Martin and Patricia Martin, trespassed into the lands of the plaintiffs by digging their borrow pit across the Hillsborough County/Pinellas County Line and into the plaintiffs' property thereby causing erosion of plaintiffs' land into the borrow pit area. In addition, it is claimed that the defendants failed to maintain the proper setback from their property line as required by Hillsborough County ordinances and that the defendants should be required to restore the land which has been excavated. The defendants, James F. Martin and Patricia Martin, in this Court's Consent Mandatory Injunction of February 27, 1985, agreed to the restoration of the property.

Plaintiff, Pinellas County, has brought individual counts against James F. Martin and Patricia Martin on the basis of the creation of a common law public and private nuisance for removal of the pollution material from the area known as the Bobby Martin Borrow Pit, storage area, and Cell IV, seeking injunctive relief and supplemental damages. A similar count has been filed against James F. Martin, C. H. Martin and Linda Martin, his wife, W. H. Martin and Ruby Martin, his wife, for the creation of a common-law public and private nuisance for the burial of pollution material in the area known as the Charlie Martin Borrow Pit also seeking injunctive relief and supplemental damages.

Pinellas County has also brought counts for negligence against the defendants, James F. Martin and Patricia Martin, for negligently burying pollution material next to the plaintiff's Eldridge-Wilde Wellfield and in Cell IV resulting in damages suffered by the plaintiff. A similar count has been brought against James F. Martin, W. H. Martin and Ruby Martin, his wife, and C. H. Martin and Linda Martin, his wife, for the alleged negligent burying of pollution material in the area known as the Charlie Martin Borrow Pit with collateral damages. This

14

Count of the complaint is also before the Court for final determination. A portion of the damages claimed by Pinellas County is the cost of removal of the pollution material from the Charlie Martin Borrow Pit ordered by the Court when the defendants refused to comply with this Court's mandatory injunction.

Also before this Court for final determination is the determination of whether or not the defendants' conduct in burying pollution, illegally disposing of pollution, hazardous and toxic materials on their property, was intentional, deliberate, reckless, and without regard to the rights of the plaintiff, Pinellas County. Additionally, the Court is to determine whether or not all of the defendants should be restrained from further creating borrow pit areas upon their property located next to plaintiff's Eldridge-Wilde Wellfield and permanently restrained from burying any substances in and upon their lands and borrow pits in the future.

The defendants have by Counterclaim sought damages for the removal of the material from the Charlie Martin Borrow Pit requesting a sum of money be awarded to compensate the defendants for the removal of fill material by Pinellas County under this Court's order. The defendants have also moved that this Court enter an order to show cause why the plaintiff, Pinellas County's Chemist, Robert Powell, should not be held in criminal contempt for allegedly committing perjury in his testimony in preliminary proceedings in this cause dealing with the question of whether or not there had been prior findings of organics and inorganics in Pinellas County's water supply in the actual production wells of Pinellas County.

Having set forth the basic issues to be determined by this Court on final hearing, the Court, sitting as the trier of fact, finds the following facts were proven by the greater weight of the evidence in this cause:

## II. THE PARTIES AND LOCATION OF THE PROPERTIES IN QUESTION

1. Plaintiff, Pinellas County, is a political subdivision of the State of Florida. (Hereinafter referred to as Pinellas County or the County) The plaintiffs, H. George Wilde and Marjorie E. Wilde, his wife, are owners of certain lands located both in Pinellas and Hillsborough Counties. The Wildes lease their property to the County as a County wellfield for the production of a potable water supply from the artesian or Floridan Aquifer. The plaintiffs, H. George Wilde and Marjorie E. Wilde, will hereinafter be referred to as the plaintiffs Wilde.

2. Under the lease arrangement between the plaintiffs Wilde and Pinellas County, the County constructed a wellfield on the property in

**15**

1953 and has operated the wellfield ever since. At present, Pinellas County has an existing permit from the Southwest Florida Water Management District for the withdrawal of 55-million gallons maximum per day and 35-million gallons average per day — per year. The water which is withdrawn from the Eldridge-Wilde Wellfield by the plaintiff, Pinellas County, consists of between 45% and 55% of the County's potable water supply which it delivers to its customers of the Pinellas County Water System. The potable water from the wellfield is delivered to more than 550,000 people in both Pinellas and Pasco Counties.

3. Water from the Eldridge-Wilde Wellfield is delivered on a retail basis by Pinellas County to its citizens in the unincorporated areas and the Cities of Largo and all beach communities. Water from the Eldridge-Wilde Wellfield is delivered on a wholesale basis to Pasco County and the Cities of Tarpon Springs, Clearwater, Pinellas Park, Dunedin, and Safety Harbor, all of which are municipalities located within Pinellas County, Florida.

4. In sum, Pinellas County's Eldridge-Wilde Wellfield is one of the four major wellfields which supplies vast quantities of potable drinking water for public use in Pinellas and Pasco Counties. The defendants have admitted through Request for Admissions that the Eldridge-Wilde Wellfield constitutes the "heart" of the Pinellas County Water System and thereby constitutes the main source of supply of water for the citizens of Pinellas County. Defendants have further admitted by Request for Admissions that without the water supply from the Eldridge-Wilde Wellfield, the citizens who live in Pinellas County, Florida, would be deprived of water needed for human consumption, fire protection, and human maintenance. Other sources of water of the Pinellas County Water System are incapable of independently supplying all of the potable water needs of its citizens.

5. The plaintiffs Wilde at the present time use the wellfield for raising of cattle and for agricultural purposes. These plaintiffs have sunk independent wells separate and apart from those of Pinellas County for the purpose of irrigation, human consumption, and the feeding and watering of livestock.

6. The defendants, James F. "Bobby" Martin and Patricia Martin, own certain lands in the Southwest quarter of Section 7, Township 27, Range 17 East, in Keystone Park Colony in Hillsborough County. Their property borders upon Pinellas County's Eldridge-Wilde Wellfield to the east. In 1978, James F. Martin and Patricia Martin obtained a permit from Hillsborough County to dig a borrow pit on

16

their property. The permit was issued for only one year and required renewal by Hillsborough County. The borrow pit permit was never renewed and, therefore, the defendants, James F. Martin and Patricia Martin, continued to dig their borrow pit from the year 1979 through 1982 without a borrow pit permit from Hillsborough County.

7. At the time of the creation of the borrow pit by James F. Martin and Patricia Martin, the defendants knew that the lands bordering their property were being used by Pinellas County as a wellfield which transported potable water to the citizens of Pinellas County.

8. A borrow pit is defined as an excavation made into the earth for the purpose of removal of soil which is commercially sold and transported from the property and utilized for such purposes as foundations for roads, foundations for interstate roads, foundations for construction of buildings, fill material, and other commercial uses.

9. The borrow pit created by James F. Martin and his wife, Patricia Martin, was approximately 11 acres in size and has been excavated to a depth of 30 to 35 feet.

10. In the year 1981, the defendants, James F. Martin and Patricia Martin, commenced filling their borrow pit illegally with pollution material consisting of organics (man-made chemicals) and inorganics (such as arsenic, lead, mercury, and cadmium), together with white goods, wood material, and other materials which could be described as garbage and construction and demolition debris. At no time did the defendants have or obtain a permit from Hillsborough County, HEPC, or the State of Florida, Department of Environmental Regulation, (hereinafter referred to as FDER), to fill the borrow pit with any debris or foreign material. These illegally dumped materials were buried below the water table of the shallow aquifer. Thus they were placed in contact with the Floridan Aquifer because of the existence of springs in the floor of the pit area and because of the geology of the pit.

11. On October 7, 1982, the defendants, James F. Martin and Patricia Martin, were cited by the HEPC for illegally filling their borrow pit with material which consisted of noxious and prohibited fill material which was in direct contact with water. After numerous citations, these defendants were ordered to remove the fill material by HEPC.

12. During the course of litigation, the areas of the defendants, James F. Martin and Patricia Martin's property which borders directly next to the Pinellas County wellfield and is separated by the Pinellas County/Hillsborough County Line, have acquired certain names

**17**

which, for the convenience of this decision, will be referred to by the Court from time to time. Immediately next to and to the south of the Bobby Martin Borrow Pit is an area which has in this case become to be known as the "storage area." This piece of property which appears to be approximately one and one-half city blocks long and wide is an area which formerly consisted of plain dirt. Located near a wooded area, the storage area was used by the defendants, James F. Martin and Patricia Martin, to store and place the fill material and pollution during the Court ordered excavation of the Bobby Martin Borrow Pit.

An additional area, known as Cell "IV," includes an area known as the "Alligator Pond." Cell IV lies to the southeast approximately 300 or 400-yards from the Eldridge-Wilde Wellfield and consists of an unwooded area. A stream flows from the Alligator Pond, dividing Cell IV, which ultimately flows into Brooker Creek and then into Pinellas County. Cell IV was apparently the first area which was utilized as a borrow pit area by the defendants for the sale of dirt. In the late 1970's, this area was excavated to a depth of between five and fifteen feet and refilled with organic and inorganic materials, garbage, and a substantial amount of fill material of unknown description and origin. The area known as Cell IV also extends across the road to the extent of approximately two to three acres where additional fill and borrow pit operations have been conducted by the defendant, James F. Martin. As of the date of the final hearing, only approximately one-half to two-thirds of the storage area has been excavated by the defendants under this Court's order. No ultimate or final tests have been taken by Pinellas County to determine whether or not the organics and inorganics found in the area have leached into the subsurface soil under the borrow pit area.

13. To the east of the Bobby Martin Borrow Pit lies an area known as the "Charlie Martin Borrow Pit" or "Tyler Road Borrow Pit." One-half of this area was a swamp once surrounded by a dense population of cypress trees. The area contains three sinkholes which provide direct access to the Floridan as well as the shallow well or surficial aquifers. A large number of the cypress trees have died and been removed because of the filling operation of the defendant owners. The gate to the Charlie Martin Borrow Pit passes within a few hundred feet of the home of the defendants, W. H. and Ruby Martin. Therefore, any trucks which would bring in pollution material would have to pass very near to the Martin home. This would put the Martins on actual notice of the type and character of all fill material buried on the property. Behind the home of W. H. Martin is a borrow pit, approximately 30 to 35-feet deep and several acres long. The borrow pit was created pursuant to permit from Hillsborough County.

18

14. During the period from 1980 to 1982, the swamp area was filled with organics and inorganics, together with over 300 barrels of chemicals at least one-third of which or 106 barrels have been demonstrated to contain hazardous waste, carcinogens, priority pollutants as designated by the Environmental Protection Agency of the United States Government, (hereinafter referred to as USEPA), garbage, wood, concrete and debris, and other noxious substances most of which were buried in contact with water and below the water table.

15. In 1981, a permit from HEPC was obtained by W. H. and C. H. Martin to fill the borrow pit with construction and demolition debris only above the water table. The water table was represented by the defendants Martin to Hillsborough County to be some 22-feet below the surface. The actual water table demonstrated by the greater weight of the evidence is close to the surface during certain seasons of the year or at a depth of between four and six feet. Therefore, any material buried in either the swamp area or borrow pit area would ultimately be directly brought into contact with the surficial or shallow well aquifer and would also be subject to rain water percolating through the fill material.

16. The Court, during the hearings in this cause, entered a temporary injunction prohibiting all defendants from further burying of pollution material in both the Bobby Martin and Charlie Martin Borrow Pits and further temporarily restrained the defendants from creating additional borrow pits upon their property.

17. The defendants have admitted by way of Answer to the plaintiffs' Third Amended Complaint in paragraph 64 that the defendant, James F. Martin, as well as the defendants, W. H. Martin and C. H. Martin and their wives, acquired title to the area known as the Charlie Martin Borrow Pit in the 1960's and that the defendant, James F. Martin, owned legal title to the Charlie Martin Borrow Pit until March 15, 1982, at which time the interest of James F. Martin was transferred by deed to W. H. Martin and Ruby Martin, his wife, and C. H. Martin and Linda Martin, his wife. During a substantial portion of the time of such ownership by James F. Martin the Charlie Martin Borrow Pit was improperly filled and excavated as alleged by Pinellas County. The Court finds on this basis that the defendants who were brothers were acting in concert with one another during the period of time that James F. Martin owned the area of the Charlie Martin Borrow Pit and that the defendants brothers had embarked upon the practice of digging out land for sale and charging for the dumping and burying of unrestricted and unknown garbage, construction debris, barrels, and other noxious materials upon such lands.

19

18. As to both the Bobby Martin and Charlie Martin Borrow Pits, the defendants Martin charged money for burying of the pollution material in the borrow pit areas and swamp.

19. All defendants knew of the existence of the County wellfield and the danger to its water supply if pollution material was buried on their property prior to commencing fill operations.

### III. *THE GEOLOGY AND HYDROGEOLOGY OF THE AREA*

20. The geology of the area of the Eldridge-Wilde Wellfield and the Bobby Martin Borrow Pit and Charlie Martin Borrow Pit is the least favorable for the burying of any type of landfill material, and organics or inorganics, in the soil. The area is geologically and hydrologically described as an area which is initially overlain with platinic sands with an accompanying surficial or shallow well water table at a depth of between the surface and some four to six feet below the surface. No confining layer or at least a sporadic confining layer exists between the surficial aquifer and the Floridan Aquifer. This sporadic or non-existent confining layer is made up of "clayey limestone" and has very little if any retardant effect upon pollution material introduced into the surficial aquifer or the overlying sands above. Instead of the characteristic solid confining layer or "Hawthorne layer" which is usually an impermeable layer which separates the surficial aquifer and the Floridan aquifer in most areas of Florida, the area of the wellfield is characterized by only sporadic clayey limestone.

21. The Floridan Aquifer is an area which commences at varying depths in the area of the wellfield at between 30 to 40-feet and consists of fractured limestone which contain many "solution channels." Clean potable water is extracted by the wells at the Eldridge-Wilde Wellfield from the Floridan Aquifer, which ranges from approximately 35-feet from the surface to several hundred feet. It contains various water producing zones which are capable of producing millions of gallons of water per day for human consumption.

22. The area is replete with "fracture traces." Most characteristic of the trace fractures which permeate the area are numerous sinkholes or low lying depressions which have collapsed and have, throughout the ages, been filled with fine grain sand thereby permitting easy access by groundwater directly into the Floridan Aquifer. The sinkholes and "solution channels" are simply collapsed portions of the earth's crust which have been filled in with sand which have no confining layer. These geological formations serve as natural direct recharge areas to the Floridan Aquifer. The maps in evidence indicate numerous fracture

20

traces and sinkholes throughout the entire area around the two borrow pits and the wellfield.

23. The Floridan Aquifer and the surficial aquifer run generally in an east to west direction. This means that any pollution introduced into the borrow pits or surrounding earth would naturally move by gravitational pull alone into the waters of the Eldridge-Wilde Wellfield.

24. Both the Charlie Martin Borrow Pit and the Bobby Martin Borrow Pit were initially excavated out of sinkholes or wetlands which existed prior to the commencement of borrow pit operations. Both borrow pits are connected by a definite and discernible *fracture trace* which runs from the east to the west through the Charlie Martin Borrow Pit, into the Bobby Martin Borrow Pit and into a discernible fracture trace within the Eldridge-Wilde Wellfield. The overwhelming weight of the evidence supports this conclusion by way of both expert testimony and the Court's review of aerial maps taken before the construction of the borrow pits. The geologic formation with the fracture trace running from one borrow pit into the other and then into the wellfield creates the absolute worst possible geological condition for burying of pollution.

25. To compound the situation, the Eldridge-Wilde Wellfield consists of 57 production wells which are permitted to pump a maximum of 55-million gallons of water per day. Hydrologically, the pumping of these wells create a "whirlpool effect" in the Floridan Aquifer thereby causing a substantial "sucking action" within an area known as the "cone of depression" for at least two to three miles from the edge of the Eldridge-Wilde Wellfield. This cone of depression actually influences the Floridan Aquifer for several miles. The end result from a hydrologic standpoint is that any water or pollutant substance which is introduced into the surficial or shallow well aquifer and into the sinkholes in the area of the wellfield will ultimately and quickly be pulled or sucked into the Floridan Aquifer and then into the wells of the Eldridge-Wilde Wellfield. For this reason, the HEPC has a rule which prohibits the burying of any landfill material within the "cone of influence" of any wellfield in the County. This rule, designed to protect the public water supply, has obviously been violated by the introduction of pollution material into both the Bobby Martin Borrow Pit and Cell IV areas and the Charlie Martin Borrow Pit.

26. One of the hydrologic tests for determining the severity of the drawing or sucking action of the wellfield and its cone of depression is the drawdown of what is known as the "potentiometric surface." From a layman's standpoint, the "potentiometric surface" is that column of

**21**

artesian pressure which the aquifer asserts above the area of the Floridan Aquifer so that, as an example, if the normal pressure of the aquifer system would push the Floridan Aquifer up into a well placed in the Floridan Aquifer by 20-feet, this 20-foot area would be known as the potentiometric surface. The "drawdown" of this potentiometric surface caused by the wellfield in the area of both the Charlie Martin and Bobby Martin Borrow Pits is substantial with the potentiometric surface being drawn down between five and seven feet. In layman's terms, this means that substantial sucking action is created in the area of the borrow pits causing water to flow more easily and rapidly from the sinkholes and surficial aquifer into the Floridan Aquifer. The Court is impressed with the magnitude of the tremendous whirlpool effect of the wells in the wellfield and its direct effect upon the introduction of any pollution material in the cone of depression of the wellfield. The Court concludes that any pollution material which is introduced into the terrain and especially into sinkholes and fracture traces in the area upgradient from the wellfield will ultimately at some time in the future, if not immediately, find its way into the wellfield and hence into the public water supply of Pinellas County.

27. In sum, the Court finds that the most adverse geologic and hydrologic conditions for the burying of pollution exist near the plaintiff's Eldridge-Wilde Wellfield. Both borrow pits have been filled with both organic and inorganic pollutants in sinkholes which have direct access to the Floridan Aquifer, in the cone of depression, where the potentiometric surface is drawn down between five and seven feet, thereby creating a tremendous sucking action or flow of water which will rapidly move any pollution into the wellfield or ultimately will move any pollution into the wellfield which is buried in the landfills. The Court takes special note of the fracture trace or solution channel which connects both of the borrow pits with the wellfield. This solution channel creates an exceedingly easy pathway for water carrying pollution to move through the landfill or borrow pit areas and then into the solution channel and rapidly into the Pinellas County wellfield and hence into the wells and the public water supply of Pinellas County.

28. In sum, not only is the areas of the borrow pits the worst place for the burying of any pollution, but it is the worst place for the burying of any substances, any solid waste, or other materials, including seemingly harmless refuse, such as organic materials which can be characterized as paper goods, woods, vegetation, and garbage. In fact, both the HEPC and FDER have rules which strictly prohibit the burying of any organic material in contact with water because the leachate from such material, including construction and demolition

22

debris, will ultimately cause a substantial deterioration of the ground-water and the waters of the Floridan Aquifer. The Court finds that the violation of these rules is supported by the greater weight of the evidence as to both borrow pits and all areas which are the subject of this litigation and in and of themselves constitute both a public and private nuisance and direct threat to the potable water supply of the Eldridge-Wilde Wellfield.

## IV. *THE PHYSICAL AND CHEMICAL NATURE OF THE MATERIALS BURIED AND/OR REMOVED FROM THE BORROW PITS AND SURROUNDING AREAS*

### A—THE CHARLIE MARTIN OR TYLER ROAD BORROW PITS

29. At the hearing on Motion for Mandatory Injunction, the Honorable David Seth Walker, Circuit Judge, found the existence of "dangerous substances, contaminants, and pollutants" which resulted from illegal dumping activities on the property and "an unbelievable collection of material of the most odious nature." The court also found that the dangerous substances, contaminants, and pollutants had already begun their migration into the earth and had already been introduced into the surficial and Floridan Aquifers. The District Court affirmed the trial court's findings. *Martin v. Pinellas County*, 444 So.2d 439 (Fla. 2d DCA 1983), at 441. In the opinion of this Court, the independent evidence presented, without considering the findings of the Court in the mandatory injunction hearing, support the conclusion that substantial quantities of dangerous substances, contaminants, and pollutants were actually buried in the Charlie Martin Borrow Pit to such an extent that over 15-tons of the material which are defined as "hazardous wastes" under the definitions of Resource Conservation and Recovery Act, (hereinafter referred to as RCRA), and the Comprehensive Environmental Response, Compensation, and Liability Act, (hereinafter referred to as CERCLA), were buried in the landfill area. These laws have been adopted by the FDER in Rule 17-30.020, F.A.C. In addition, the United States Environmental Protection Agency (hereinafter referred to as USEPA), has designated approximately 129 pollutants as "priority pollutants." Priority pollutants are those pollutants out of the many hundreds of thousands of compounds or chemicals produced by man which the USEPA has determined to be most hazardous and a threat to human life and health. These substances are both carcinogenic, mutagenic, and can even in certain forms cause immediate death. Out of the list of 129 pollutants, approximately 85 of these priority pollutants were identified in tests conducted of the

23

materials removed from the Charlie Martin Borrow Pit. In addition, as stated, these compounds listed hazardous waste under CERCLA and under RCRA were identified in great abundance by experts from Environ Corporation in Washington, D.C., who did an independent study of all of the material found at both pits.

30. The most significant compilation of data analyzed by Environ Corporation experts was the list of 27 contaminants found in either monitor wells or production wells of the Eldridge-Wilde Wellfield and also found in the Bobby Martin and Charlie Martin Borrow Pits. The list of these contaminants unquestionably demonstrates the fact that organics and inorganics which are substantially dangerous to the health, safety and welfare of the public have been buried in the Charlie Martin and Bobby Martin Borrow Pits, have infused into the Floridan Aquifer and surficial aquifer, and have migrated or have been drawn into the wellfield itself. As a result of this direct contamination of the wellfield, 13 wells have been required to be shut down by Pinellas County for fear of pumping these pollutants into the public water supply which would result in human consumption. The correlation between the finding of pollutants in both borrow pit and landfill areas as well as Cell IV has amply demonstrated to the Court by not only the greater weight of the evidence but by clear and substantial evidence that the borrow pits have in fact and in deed contaminated and actually polluted the public water supply wells of Pinellas County.

31. Chemical tests taken from monitor wells along the fracture trace which runs between the two sinkholes of the two pits and into the wellfield produced the most consistent evidence of entry of pollution into the wellfield. These tests were conducted by Pinellas County and also by the USEPA through a corporation known as "NUS" and the Emergency Response Team of the USEPA. In view of the fact that not only Pinellas County's tests but those of other governmental agencies have confirmed the penetration of pollution from the east and into the eastern part of the wellfield, the Court finds that more than ample evidence exists of both a public and private nuisance caused by the two Martin borrow pits.

32. The Court has reviewed literally hundreds of photographs of materials which have been excavated from the Charlie Martin and Bobby Martin Borrow Pits. These photographs demonstrate conclusively that dangerous substances, contaminants, and pollutants have indeed been buried in both of the borrow pits and their surrounding landfills. In addition, the Court has reviewed several hours of video-tapes of the excavation of materials from the Charlie Martin Borrow Pit. These video-tapes show the removal of numerous barrels of both

24

liquid and semi-solid, and solid substances in substantial quantities as the excavation progressed. The evidence shows that approximately 313 barrels were found. One hundred six of these barrels were determined by FDER to constitute hazardous waste and were shipped to Pinewood, South Carolina, to a hazardous waste disposal site. These substances were so hazardous that no landfill in the State of Florida exists which under law is capable of receiving such materials. The greater weight of the evidence shows that a minimum of 15-tons of this hazardous waste was shipped to Pinewood. These substances can be listed under the listing mechanism of RCRA as a hazardous waste and are dangerous to human health and hence constitute a hazardous waste under CERCLA. As stated, FDER has adopted both of these laws as controlling under their rules and regulations. The tests taken of the substances found in the barrels show a plethora of contaminants which are alarming to the Court. Almost every expert appearing in this case, even those testifying on behalf of the defendants, agree that if such hazardous wastes existed in the borrow pit area that they must be excavated and properly disposed of in a hazardous waste landfill.

33. The Court has seen video-tapes and still pictures of material being excavated from the Charlie Martin Borrow Pit which indicates that most of the material was buried below the water table and that groundwater was found in all of the drums found to contain hazardous waste. Almost all of the drums, including "empty drums," had been severely punctured thereby exposing their contents to groundwater. Although two-thirds of the barrels were found empty, they had been inundated and buried in the water table in the swamp area in the sinkhole. The Court finds good evidence that these barrels may have been actually crushed on-site, contained chemicals at the time they were crushed, and that their contents have leached out into the water table, and sinkhole area, and ultimately into the Floridan Aquifer. The Court has viewed video-tape evidence showing a large area of leachate, black in nature, approximately six inches deep on the floor of the Charlie Martin landfill area. Chemical results taken from this area demonstrate that a substantial amount of leachate most probably came from the barrels and other waste materials and was actually deposited in a leachate sill at the floor of the sinkhole. Such contamination in the sinkhole, direct access to the Floridan Aquifer, without question had to be excavated and removed and constituted a clear and present danger and toxic threat to the water supply and the Eldridge-Wilde Wellfield.

34. In fact, soil tests and water tests taken in both borrow pits demonstrate to the Court that a likely source of pollution were chemical trucks which dumped their chemicals even during the night-

time, directly into the sands and other debris of the borrow pits thereby creating a substantial pollution problem in and of themselves. Reports of the appearance of chemical trucks or trucks which dispose of septic tank and chemical waste in the area of the borrow pit plus the contamination of certain areas of the borrow pits without the presence of nearby barrels leads the Court to find by the greater weight of the evidence that the existence of such soil samples can only reasonably be explained by the intentional and promiscuous dumping of chemicals into the landfill and borrow pit areas.

35. FDER documents indicate that a substantial number of FDER employees and high-ranking officials approved the removal order of this Court and were in favor of removal of the landfill pollution material at the Charlie Martin Borrow Pit. Preliminary FDER evaluations indicated that the Charlie Martin Borrow Pit and the Bobby Martin Borrow Pit would easily qualify for Federal Superfund consideration and for removal operations.

36. FDER did participate in paying for the pollution removal under this Court's order of the hazardous waste at a cost of approximately $10,100.00. The removal of this hazardous waste is sufficient evidence to characterize the Charlie Martin Borrow Pit as a "hazardous waste dump." This hazardous waste would not have been discovered if Pinellas County and the Court had not taken action to remove the fill material at the Charlie Martin site.

37. Therefore, from the greater weight of the evidence, the burying of the material at the Charlie Martin Borrow Pit created a public and private nuisance which not only threatened but has actually polluted the waters and wellfield of the plaintiff, Pinellas County. The materials constituted a hazard to the Eldridge-Wilde Wellfield and caused a toxic threat to the Pinellas County water supply and hence to its wellfield. It further created a clear and present danger to all plaintiffs' use of their property as a source of public and private water supply. The burying of the pollution material exposed the shallow and artesian aquifer to contaminants and pollution and because of the geological formation and filling of the pit with pollutants and other noxious material infringed upon the public's right to pure soil and water by threatening the public water supply of the public's governmental agency charged with the responsibility of providing safe, clean potable water to the people of Pinellas County. Hence, the greater weight of the evidence shows that the Charlie Martin Borrow Pit not only constituted a private nuisance, but a public nuisance as well.

26

## B—THE BOBBY MARTIN BORROW PIT

38. The Court, in the preceding paragraphs, has also described much of the evidence viewed by the Court as to the pollution material buried at the Bobby Martin Borrow Pit area and Cell IV. The chemical tests and evidence likewise require similar findings by the Court that the materials buried in the Bobby Martin Borrow Pit and surrounding landfill and Cell IV constituted a toxic threat to the public water supply of Pinellas County. It further constituted a clear and present danger to the public water supply by the burying of organic and inorganic pollution materials which were and did constitute hazardous waste under RCRA and CERCLA. Several barrels of material containing hazardous substances and chemical substances have also been found at the Bobby Martin Borrow Pit with accompanying underlying leachate which has still not been removed from the floor of the Bobby Martin Borrow Pit. One witness who was a workman hired by the contractor by Bobby Martin testified that Bobby Martin instructed him to "hide" any barrels he excavated and to run over County employees. Mr. Martin never took the stand to deny the testimony and the Court finds such testimony to constitute one of the controlling facts of this case. The workman was fired almost immediately after advising County officials of the conversation.

39. The Bobby Martin Borrow Pit lies within approximately 280-feet from Wells 13 and 14 of Pinellas County used to pump water to the public. Its close proximity and that of Cell IV make it an obvious constant danger and threat to Pinellas County's water supply. Notable is the test showing soluble cyanide in substantial proportions which was *hidden* by the defendants or their consultants from Pinellas County and only recently discovered by subpoena by Pinellas County. These tests taken in 1983 and not revealed to the plaintiff show soluble cyanide in such substantial portions that the existence of such material in a borrow pit 280-feet from a public water supply in and of itself constitutes a clear and present danger, a toxic threat, and an immediate threat to the public water supply of Pinellas County and hence a public and private nuisance.

40. Having found that the same general type of pollution material had been buried in the Bobby Martin Borrow Pit, the Court does not find it necessary to make any further findings of fact in this regard. While the Charlie Martin Borrow Pit indeed contained many more barrels of pollution, there is direct evidence that chemical trucks and septic tank trucks have also dumped their pollution loads in various areas of the Bobby Martin Borrow Pit which were not near any found containers to such an extent that a toxic threat to the wellfield was in and of itself created.

27

41. Evidence would indicate that the potential for the burying of many more barrels of chemicals and other pollutants exists through the testimony of lay witnesses who live around the area of Cell IV. In addition, nighttime dumping has also occurred in Cell IV. The Court finds that as a result, the Consent Mandatory Injunction and this Court's order requiring immediate removal of the pollution material in Cell IV should be and is affirmed. The pollution material should have long ago been removed by the defendant, Bobby Martin, which could have conceivably prevented the pollution of the monitor wells and production wells of Pinellas County in its wellfield. As such, there is an overwhelming amount of evidence sufficient for this Court to find as the trier of fact the existence of both a public and private nuisance and to immediately order with all due and deliberate speed the removal of the pollution material by the defendants, James F. Martin and Patricia Martin, as soon as possible.

## V. TESTIMONY OF NON-EXPERT OR LAY WITNESSES

42. A number of neighbors or people who had lived around the Eldridge-Wilde Wellfield testified in this cause. The Court finds by the greater weight of the evidence that the testimony of such neighbors and observers is sufficient to carry the burden of proof of the plaintiffs in regard to the type and nature of the pollution material buried at both the Charlie Martin and Bobby Martin Borrow Pits.

43. Illegal and secretive nighttime dumping was conducted at both borrow pits which leads the Court to conclude that the defendants knowingly, willingly and willfully buried hazardous material in the borrow pit areas which they did not wish the surrounding neighbors to observe. The chemical tests, when correlated with this testimony, conclusively demonstrates the intentional burying of hazardous pollutants in both borrow pits. A number of neighbors heard the working of machinery at all hours of the night and two witnesses actually observed the act of late night or early morning dumping.

44. The defendants have demonstrated that further permitting them to apply for borrow pit permits in the cone of depression of the Eldridge-Wilde Wellfield could and would lead to additional pollution of the Floridan Aquifer and surficial aquifer such as to constitute a clear and present danger and toxic threat to the wellfield. The defendants' own expert testimony indicates that the opening of the aquifer system by borrow pits to septic tanks and other potential sources of pollution in the area is hydrologically unsound and contrary to the public interest where a public water supply is located. Therefore, the evidence is sufficient to permanently enjoin the defendants, James F.

28

Martin and Patricia Martin, from applying for any additional borrow pit permits upon their land that borders the Eldridge-Wilde Wellfield and to further prohibit them from burying any further substances on their lands in the cone of depression of the County's wellfield.

45. Additional lay testimony as to the involvement of the defendants, W. H. Martin and C. H. Martin, with the Hillsborough County Environmental Protection Commission shows that the HEPC failed to properly monitor the burial of unpermitted as well as permitted disposal of waste material. Numerous neighbors around the Charlie Martin Borrow Pit indicate that everything imaginable in the way of garbage and waste was buried in the Charlie Martin Borrow Pit. They further indicated that the water table at the Charlie Martin Borrow Pit and swamp area was at or near the surface of the land. Under such circumstances, the Court finds that the observations of such neighbors or lay witnesses constitute the greater weight of the evidence in this cause.

## VI. TESTIMONY OF EXPERT WITNESSES

46. The Court heard the testimony of numerous expert witnesses tendered to the Court who advanced their opinions on the subject of geology, hydrology, hydrogeology, engineering, general environmental sciences, the application of the rules and regulations of the HEPC, FDER, RCRA, and CERCLA, and toxicology. All of the expert witnesses who appeared were of substantial help to the Court in making its decision in this cause. Through the expert testimony, it was apparent that there was substantial conflict in the testimony produced by the plaintiff, Pinellas County, and the defendants Martin in this cause which, as the trier of fact, the Court resolves in favor of the plaintiff, Pinellas County.

47. The expert witnesses produced by the plaintiffs in this cause were most persuasive. Through this opinion, the Court adopts their conclusions that both borrow pits and the surrounding landfill areas were filled with toxic chemicals and pollutants which were both organic and inorganic in nature which not only threatened the groundwater and water supply in the Floridan Aquifer but has actually polluted the Eldridge-Wilde Wellfield. All of plaintiffs' experts demonstrated a total and thorough knowledge of all of the data and hydrologic and geologic formations in the wellfield and borrow pit areas. The Court finds particularly persuasive the testimony of the three experts presented by Environ Corporation who analyzed the entire problems of both pits from an environmental, engineering, hydrologic, geologic, and toxicology standpoint. Their analysis and conclusion that hazardous pollu-

**29**

tants have been buried in the borrow pits and have entered the Floridan Aquifer and then into the Eldridge-Wilde Wellfield has convinced the Court that a verdict for the plaintiff is required in this cause.

48. To the contrary, each of the defendants' experts admitted they had not examined all of the available data, and the testimony of the experts from FDER were conflicting and not believable. The testimony of defendants' expert hydrologist, Jay Lehr, was for the most part supportive of plaintiffs' position. Consequently, his testimony alone would not support a judgment for defendants.

49. All of the expert witnesses, including defendants' experts, admitted that if hazardous waste and pollutants were buried in a sinkhole in a fracture trace in the cone of depression of a wellfield that such hazardous material must be removed. Since the Court finds that such facts are supported by the greater weight of the evidence the defendants' own expert testimony cannot serve as a basis for finding for the defendants in this cause.

50. Only two experts were tendered to the Court on the question of toxicology and the potential lethal and long-term effect of the pollutants when drunk by human beings. Both experts were produced by the plaintiff. Their testimony showed that a number of the pollutants found in both borrow pits, in the soil tests, drum tests, and water tests, and in particular in the monitor and test wells of Pinellas County (by not only Pinellas County but USEPA and the Emergency Response Team) that the drinking or ingestion of water containing such substances even in parts per billion will be and does constitute a threat to human safety and the public welfare. Both long-range and short-range effects of such pollutants when introduced into a water supply of a major wellfield cannot under any circumstances be permitted. The immediate threat of certain chemicals to pregnant women, the elderly, and even the normal person are totally unacceptable. The evidence testified to by Dr. Gary Gordon, a person of substantial experience on the ingestion of trace inorganic elements even below drinking water standards, indicates that the long-range toxic and mutagenic effects of the ingestion of such inorganics as lead, mercury, cadmium, and arsenic are unacceptable and should not, if possible, be introduced into a public water supply. The evidence is credible that even a thimble full of certain organics or chemicals found in the borrow pits when placed in a swimming pool of water can be most lethal to those who would come in contact with such water. Therefore, the overwhelming and certainly greater weight of the evidence indicates that indeed a serious and toxic threat to the public water supply by the exiting borrow pits and their accompanying

30

landfills has been proven to the Court to its satisfaction and by the standards required by law.

51. The Court notes that the only testimony available for consideration by the USEPA Emergency Response Team which tested and analyzed the Bobby Martin Borrow Pit indicated that the pit material was of such a dangerous nature when in contact with water that the Emergency Response Team would have to take emergency action of removal had the Court not already ordered the removal. These facts additionally support the Court's conclusion that the Bobby Martin Borrow Pit indeed constituted a toxic and dangerous threat to the County's water supply.

## VII. *PUBLIC AND PRIVATE NUISANCE*

Based upon the findings of fact that the borrow pits and surrounding areas contained dangerous substances, contaminants, and pollutants and an unbelievable collection of material of the most odious nature and hazardous waste under RCRA and CERCLA, the Court concludes that both the Bobby Martin Borrow Pit, Cell IV, and the Charlie Martin Borrow Pit, do constitute both a public and private nuisance. The Court has further found that there have been numerous violations of the pollution laws and regulations of the HEPC, the FDER, RCRA, and CERCLA. While not conclusive, the Court is persuaded that the violation of these pollution laws constitute sufficient evidence as a matter of fact together with the other findings of fact in this opinion to constitute a sufficient basis for the finding of a public and private nuisance. The plaintiff urges that the evidence is sufficient to find a public and/or private nuisance "per se." The Court finds that such finding is unnecessary in view of the factual findings by the Court that as a matter of fact by the greater weight of the evidence there has been created by all of the defendants in both borrow pits both a public and private nuisance by the actual contamination and threat of contamination of the water and public water supply of the Eldridge-Wilde Wellfield.

## VIII. *TRESPASS*

52. Evidence at the venue trial in this cause has been placed before the Court for its consideration. Upon the basis of the testimony before the Court generally given by experts, it is obvious that the greater weight of the evidence is that the defendants, James F. Martin and Patricia Martin, have committed a trespass against all of the plaintiffs in this cause by digging their borrow pit into the lands of the plaintiffs, causing erosion of plaintiff's land, and endangering plaintiff's land by

31

failure to maintain the edge of the borrow pit a sufficient distance from the plaintiff's and defendants' property line. Pictures in evidence demonstrate ample digging of the borrow pit into the plaintiff's land and the accompanying erosion of plaintiff's land caused by the defendants' borrow pit.

53. The defendants have agreed in the Consent Mandatory Injunction to replace the area of trespass and to replace the fill material in the borrow pit. Therefore, the Court finds that by the greater weight of the evidence, the defendants, James F. Martin and Patricia Martin, have committed a trespass against the plaintiffs, and said defendants are ordered to comply with the requirements of replacing such land and repairing the wall of such borrow pit under the specific terms and conditions of this Court's Consent Mandatory Injunction.

## IX. NEGLIGENCE

54. Based upon the findings of fact, the Court finds that the defendants have not only carelessly and negligently filled their borrow pits with pollution thereby proximately causing damage to the plaintiff, but that such filling of such borrow pits for profit was willful and malicious, sufficient to award the plaintiff, Pinellas County, damages which have proximately been caused by the negligence of all of the defendants.

## X. WILLFUL AND MALICIOUS CONDUCT

55. It has become necessary under federal authority for this Court to determine whether or not the conduct of defendants in this case was such that they illegally disposed of pollution, hazardous and toxic materials on their property intentionally, deliberately, recklessly, and without regard to the rights of the plaintiff, Pinellas County, and whether or not by virtue of such willful, intentional and reckless acts that Pinellas County has been injured. The Court makes this finding and finds that there is more than sufficient evidence to support such conclusions by the greater weight of the evidence and indeed by evidence which is clear and convincing.

56. The defendants themselves have admitted in their testimony that they had knowledge of all of the material that was buried in their respective borrow pits. They also have admitted that they knew that if polluted or hazardous material was placed in their borrow pits that it would contaminate the water and water supply in the area, and that they should refrain from burying such pollution on their property. Since the material was buried for profit, and the metallurgical evidence in the case indicates that the barrels in question, including the barrels

32

found to be empty at the time of excavation, were filled with various chemicals of all types and descriptions, and were deliberately ruptured on site thereby strewing their chemicals into the native soil and then into the water supply, the Court finds that there is sufficient ample testimony to find that the actions of the defendants were intentional, deliberate, reckless, and without regard to the rights of the plaintiff, Pinellas County.

57. Although the defendants emphatically deny midnight dumping, they acknowledged that the existence of midnight dumping would lead to no other conclusion than hazardous materials were intentionally and deliberately and recklessly being dumped in the respective borrow pits. The Court finds that by the greater weight of the evidence that their denial cannot be sustained. Evidence of impartial third parties that regular and consistent midnight dumping was occurring, constitutes the more persuasive evidence. When the conflicts in the evidence are resolved, the Court finds that the greater weight of the evidence indicates that the defendants did intentionally and deliberately and recklessly and without regard to the rights of the plaintiffs, illegally dispose of pollution, hazardous and toxic materials thereby damaging and injuring the plaintiff, Pinellas County.

## XI. *DAMAGES*

58. Pinellas County claims as damages, in the way of an award of monetary relief, the cost of construction of monitor wells, costs for testing, monitoring, and for professional consultants' efforts in detection and avoidance of the pollution, costs for the diversion of Pinellas County's personnel from other tasks to assist with testing, monitoring, and related capacities, and prejudgment interest on such amounts as to the Bobby Martin Borrow Pit and Cell IV.

59. The only testimony offered at trial on the issue of damages was that of the plaintiff, Pinellas County, as to the amounts spent concerning the Bobby Martin Borrow Pit and Cell IV, and that such costs were both necessary and reasonable and commensurate with the charges that would usually be made in the community for similar costs or services. The Court finds such contentions to be supported by the greater weight of the evidence. Therefore, the Court upon finding liability of public and/or private nuisance and negligence awards the following elements of damages:

a. Cost of construction of monitor wells;

b. Cost for testing, monitoring and for professional consultants' efforts in detection and avoidance;

**33**

c. Cost for diversion of Pinellas County personnel from other tasks to assist with testing, monitoring, and other related capacities; and

d. Prejudgment interest.

60. Therefore, the Court finds by the greater weight of the evidence that the total amount of damages which the Court awards Pinellas County against the defendants, Bobby Martin and Patricia Martin, because of their dumping of pollution in the Bobby Martin Borrow Pit and Cell IV to be $225,599.02 together with prejudgment interest in the amount of $38,153.58.

61. As to the Tyler Road borrow pit, or Charlie Martin Borrow Pit, the plaintiff, Pinellas County, contends that it should be entitled to monetary damages for cost of construction of monitor wells, cost for testing, monitoring, and for professional consultants' efforts in detection and avoidance, cost of diversion of Pinellas County personnel from other tasks to assist with testing, monitoring, and other related capacities, cost for excavation and removal and clean-up of the Tyler Road, or Charlie Martin Borrow Pit, and prejudgment interest.

62. The plaintiff is the only party who has put on evidence as to the claim for monetary relief in regard to the Charlie Martin or Tyler Road borrow pit. Such testimony has indicated that the claimed costs and services were reasonable, necessary, and commensurate with the ordinary costs expected in the community for similar costs and services. The Court finds that such claim is supported by the greater weight of the evidence.

63. Therefore, the Court finds that because liability has been established on the grounds of a public and/or private nuisance and negligence that Pinellas County should be awarded the following monetary relief for the following elements of damages:

a. Cost of construction of monitor wells;

b. Cost for testing, monitoring, and for professional consultants' efforts in detection and avoidance;

c. Cost for diversion of Pinellas County personnel from other tasks to assist with testing, monitoring, and other related capacities;

d. Cost for excavation and removal and clean-up of Tyler Road borrow pit by Pinellas County; and

e. Prejudgment interest.

64. The Court therefore awards damages in the amount of $2,999,393.68 together with prejudgment interest in the amount of $587,191.35 against C. H. Martin and Linda Martin, his wife, and W. H. Martin and Ruby Martin, his wife, jointly and severally.

34

65. The Court has determined that James F. (Bobby) Martin is liable to Pinellas County by virtue of his ownership of the lands of the Tyler Road borrow pit during the time of the pollution activities and creation of the public and private nuisance and negligence as further supported by the findings of fact as stated in this opinion. Therefore, the full amount of the damages and prejudgment interest awarded as to the Tyler Road borrow pit or Charlie Martin borrow pit shall be entered against James F. (Bobby) Martin in the sum of $3,586,585.03. The Court finds that such amount must be assessed against the defendant because the damages are not capable of being severed and by virtue of the fact that the defendants have admitted that James F. (Bobby) Martin was the owner of the property during the time of the illegal burying of the pollution. As an aside, *the Court notes in assessing the liability of James F. (Bobby) Martin for his ownership interest in the Tyler Road borrow pit, that the defendant, James F. (Bobby) Martin, has been named as a counter-claimant in this cause for replacement of the fill material which the Court construes as a further admission of liability on the part of James F. (Bobby) Martin for all damages suffered by Pinellas County as a result of burying of pollution in the Tyler Road or Charlie Martin borrow pit.*

66. The Court finds that the liability for the cost of construction of monitor wells, cost for testing, monitoring, and for professional consultants' efforts in detection and avoidance, costs for diversion of Pinellas County personnel from other tasks to assist with testing, monitoring, and other related capacities, should be assessed against all defendants jointly and severally in the amount of $323,767.58 together with prejudgment interest in the amount of $29,634.77.

## XII. *DEFENDANTS' COUNTERCLAIM*

67. Because of the findings of fact by this Court in this opinion, the Court finds that the defendants should not recover on their counter-claim against Pinellas County for the amount of fill material from the Tyler Road borrow it.

## XIII. *EQUITABLE RELIEF AND ORDERS OF CONTEMPT*

68. There are a number of other issues which are to be determined by the Court upon final judgment which require the Court to make findings of fact in this final judgment, and require the Court to enter either a final judgment in this document, or by separate order. The first of these issues is the determination of civil contempt as to James F. (Bobby) Martin for failure to remove the fill material contained in the Bobby Martin borrow pit and Cell IV area. Based upon the fact that

**35**

this Court entered its Order in December of 1982 directing the defendant, James F. (Bobby) Martin, to remove all of the pollution material contained in his borrow pit, and subsequently entered an Order by Consent Mandatory Injunction whereby the defendant consented to remove the pollution material from his borrow pit and the Cell IV area, and in consideration of this Court's Order requiring the defendant, James F. (Bobby) Martin, to remove the pollution material from Cell IV on or before August 25, 1986, the Court finds the defendant, James F. (Bobby) Martin, to be in civil contempt of all three of such Court's Orders. The testimony at trial clearly indicates that the defendant could have removed the fill material from the borrow pit and Cell IV long before the final hearing in this cause by the use of proper machinery, and that the other legal requisites of holding the defendant, James F. (Bobby) Martin, in civil contempt have been met and are sustained by the greater weight of the evidence in this cause.

In addition, the defendant's sentence which he was serving for civil contempt of this Court's Consent Mandatory Injunction has not been completed in the amount of 30 days. Because of the recalcitrance of the defendant, and the fact that the greater weight of the evidence shows that the defendant has been privateering and attempting to only make money from his borrow pit removal procedures rather than remove the pollution as soon as possible, and has made the sum of almost a quarter of a million dollars which has been paid to him or is owed by the excavator, and because after numerous continuances and the leniency of this Court which has been granted to such defendant, the Court is convinced that the only remaining remedy is to Order the defendant, James F. (Bobby) Martin, to jail for civil contempt until such defendant has totally and completely complied with this Court's three Orders requiring the removal of the pollution material in the Bobby Martin borrow pit and Cell IV. This shall include the testing and certification of such borrow pit to be clean of pollution as required by all Orders. A separate Order shall be entered requiring the defendant to submit himself for confinement in the Pinellas County jail until all of the pollution has been removed from the borrow pit and Cell IV areas and the meeting of the other conditions of such Orders.

69. The District Court of Appeal has affirmed this Court's finding of W. H. Martin and C. H. Martin to be in criminal contempt and a Warrant of Commitment shall be separately issued requiring the serving of such sentences. *See Martin v. Pinellas County*, 483 So.2d 445 (Fla. 2d DCA 1986).

70. Based upon the findings of fact by this Court, this Court's

Emergency Mandatory Injunction and subsequent Orders requiring removal of the pollution material from the Tyler Road or Charlie Martin borrow pit is confirmed and made a final judgment. The Court makes this finding independent of any evidence heard or considered by the Honorable David Seth Walker, Circuit Judge, in entering the Mandatory Injunction. The Court has, under the instructions of the District Court in the case of *Martin v. Pinellas County*, 444 So.2d 439 (Fla. 2d DCA 1983), given both parties the opportunity to present any additional evidence which will enable the Trial Court to determine the necessity for a permanent injunction and otherwise fashion a final judgment as required by the District Court's opinion. The Court finds, based upon the findings of fact as stated in this opinion, that the Mandatory Injunction should be and is hereby affirmed.

71. In view of the Court's finding of contempt of the defendants for failure to comply with this Court's Mandatory Injunction requiring the removal of pollution material from the Tyler Road or Charlie Martin borrow pit, which penalty was reserved by the Court upon finding of contempt, the Court has determined that a monetary penalty against the defendants, Charles Martin, Linda Martin, Billy Martin, and Ruby Martin should be imposed for failure to comply with this Court's Emergency Mandatory Injunction. The Court specifically finds that this penalty is separate and apart from any compensatory damage to which plaintiff, Pinellas County, may be entitled as previously ordered and directed by the Honorable David Seth Walker at the time of the entry of the finding of contempt. Therefore, based upon the evidence, and by the greater weight of the evidence, the Court finds that a separate and distinct compensatory monetary penalty or fine be and the same is hereby entered against such named defendants in the amount of $100,000.00.

72. The defendants have filed a Motion to hold Pinellas County's chemist Robert Powell in contempt of this Court's authority by committing perjury in his testimony in prior preliminary proceedings in this cause. The Court finds that there is insufficient evidence to issue an Order to Show Cause why the Pinellas County chemist, Robert Powell, should be held in contempt of this Court's authority by committing perjury, and therefore an Order to Show Cause shall not be issued.

73. This Court has previously entered an Order finding the defendant, James F. (Bobby) Martin, in civil contempt of the Court's Consent Mandatory Injunction. That Order of civil contempt was affirmed on appeal. *See Martin v. Pinellas County*, 1493 So.2d 459 (Fla. 2d DCA 1986). As part of that appellate proceedings, James F. (Bobby) Martin applied to this Court for a Stay of Civil Contempt

Order pending appeal which Stay Order was conditioned upon a bond of "Personal Undertaking." No further security was required of the defendant. This Court then required both James F. (Bobby) Martin and Patricia Martin to execute the Personal Undertaking as a precondition of the stay of the Court's Order. The terms and conditions of the Stay Bond were not disturbed by the Second District Court of Appeal. Therefore, this Court finds that the plaintiff, Pinellas County, is entitled to enforce and collect its damages attributable to the failure or refusal of James F. (Bobby) Martin to timely comply with this Court's Consent Mandatory Injunction, and to move against the Stay or Supersedeas Bond or Personal Undertaking. Therefore, based upon the greater weight of the evidence in this case as recited in this Court's opinion, the Court therefore assesses the amount of $616,154.95 in damages as assessable against the Stay Bond or Supersedeas Bond or Personal Undertaking. The Court further finds that the execution of the Personal Undertaking by the defendants, James F. (Bobby) Martin and Patricia Martin, was intended to wave and had the legal effect of waiving any exemption which the defendants might have under law including homestead exemption under the laws of the State of Florida, and such execution shall issue without application of any such exemptions.

74. The Court finds that the Temporary Injunction restraining the defendants, James F. (Bobby) Martin and Patricia Martin, from further applying for any borrow pit permits in Hillsborough County as to all of their land that surrounds or is in the cone of depression of the Eldridge-Wilde Wellfield should be made permanent.

75. The Court finds that the Temporary Injunction restraining James F. (Bobby) Martin and Patricia Martin from burying any material or pollution material in and about their lands that border upon the Eldridge-Wilde Wellfield should be made permanent.

76. The Court finds that the Temporary Injunction temporarily restraining the defendants, C. H. Martin, Linda Martin, W. H. Martin, and Ruby Martin from burying any materials or pollution materials on their property which lies near the Pinellas County Eldridge-Wilde Wellfield should be made permanent.

The Court finds that this Court's Consent Mandatory Injunction entered in this cause against the defendants, James F. (Bobby) Martin and Patricia Martin, should be made a part of this Court's final judgment and order.

## XIV. *DEFENDANTS' AFFIRMATIVE DEFENSES*

77. The defendants have pled many affirmative defenses to plaintiffs'

38

Third Amended Complaint. The Court finds as the trier of fact that the defendants have failed to carry their burden of proving their defenses by the greater weight of the evidence and therefore the Court finds that the affirmative defenses of the defendants cannot substantiate a verdict for the defendants.

## XV. CONCLUSIONS OF LAW AND FINAL JUDGMENT

IT IS, THEREFORE, ordered and adjudged that final judgment be and the same is hereby entered for the plaintiffs, Pinellas County, a political subdivision of the State of Florida, and H. George Wilde and Marjorie E. Wilde, plaintiffs, against the Defendants, James F. Martin and Patricia Martin, his wife, W. H. Martin and C. H. Martin, his wife, as follows:

1. The Court finds for the plaintiffs, Pinellas County and H. George Wilde and Marjorie E. Wilde, on Count I for trespass and orders that the terms of the Consent Mandatory Injunction entered by this Court on February 27, 1985, be and the same are hereby made a part of and do constitute a portion of this Court's final judgment. Therefore, the defendants, James F. Martin and Patricia Martin, are hereby mandatorily ordered to replace the land excavated by the defendants into the plaintiff's land in such a fashion that no further erosion of plaintiff's land shall occur, and to fill the westerly side of the defendants' borrow pit with clean fill so that the edge of the borrow pit is no less than 20 feet from the joint property line of the defendants and the plaintiffs within three months of the date of this judgment.

2. The terms and conditions of this Court's Consent Mandatory Injunction, dated February 27, 1985, which is attached to this final judgment as Exhibit "A", be and the same is hereby confirmed, ratified, and approved and made a part of this final judgment as if such terms were inscribed herein.

3. The Court finds for the plaintiff, Pinellas County, on Counts II, III and IV, and against the defendants, James F. Martin and Patricia Martin, and awards Pinellas County damages and prejudgment interest in the total amount of $263,756.60 for which sum let execution issue.

4. The Court finds for the plaintiff, Pinellas County, and against the defendants, James F. Martin, William H. Martin and Ruby Martin, his wife, and Charles H. Martin and Linda Martin, his wife, jointly and severally, as to Counts V and VI, and awards Pinellas County damages and prejudgment interest in the amount of $3,586,585.07 for which sum let execution issue.

5. The Court finds against the defendants, James F. Martin and

**39**

Patricia Martin, his wife, C. H. Martin and Linda Martin, his wife, and W. H. Martin and Ruby Martin, his wife, jointly and severally and awards damages and prejudgment interest in the total amount of $352,402.35 for which sum let execution issue which damages arise from those matters which are not severable and are attributable to the actions of all the defendants.

6. The defendants, James F. Martin and Patricia Martin, be and the same are hereby permanently restrained and enjoined from expanding and/or maintaining a borrow pit upon their property and from further excavation of their property for borrow pit purposes.

7. The defendants, James F. Martin and Patricia Martin, are hereby permanently enjoined and restrained from applying for or making any application for a borrow pit permit with Hillsborough County for the construction of a borrow pit upon their lands or the extension of a borrow pit on their lands.

8. The defendants, W. H. Martin and Ruby Martin, his wife, C. H. Martin and Linda Martin, his wife, be and the same are hereby permanently restrained and enjoined from expanding and/or maintaining a borrow pit upon their property and from further excavation of their property for borrow pit purposes.

9. The defendants, W. H. Martin and Ruby Martin, his wife, C. H. Martin and Linda Martin, his wife, are hereby permanently enjoined and restrained from applying for or making any application for a borrow pit permit with Hillsborough County for the construction of a borrow pit upon their lands or the extension of a borrow pit on their lands.

10. The Court finds that all monetary judgments entered by this Final Judgment are as the result of the defendants' conduct in illegally disposing of pollution, hazardous, and toxic materials on their properties which was intentional, deliberate, reckless, and without regard to the rights of the plaintiff, Pinellas County.

11. The Court finds the defendants, W. H. Martin and Ruby Martin, his wife, C. H. Martin and Linda Martin, his wife, to be in civil contempt for their refusal to comply with this Court's Emergency Mandatory Injunction dated June 20, 1983, requiring removal of the pollution material from the Tyler Road or Charles Martin Borrow Pit. Therefore, the Court hereby assesses a fine against said defendants which shall constitute a penalty which is separate and apart from any compensatory damage to which Pinellas County may be entitled in the sum of $100,000.00. The defendants are ordered to pay said fine into the Registry of the Clerk of Court of Pinellas County for further

disposition by order of this Court within six (6) months of the date of this order. The Court expressly reserves jurisdiction for entry of further orders in regard to the assessment of this fine which may, but shall not necessarily require issuance of execution. The Court finds that the assessment of this penalty is the result of an intentional, deliberate, and reckless act without regard to the rights of the plaintiff, Pinellas County.

12. The Court confirms this Court's finding of criminal contempt against W. H. Martin and C. H. Martin and shall issue a Warrant of Commitment by separate order.

13. On the Counterclaim of the defendants, James F. Martin, W. H. Martin and Ruby Martin, his wife, and C. H. Martin and Linda Martin, his wife, the court finds for the counter-defendant, Pinellas County, and therefore, the counter-plaintiffs shall take nothing by their suit and the counter-defendant, Pinellas County, shall go hence without day.

14. The Court finds that the plaintiff, Pinellas County, has been damaged by the delay of James F. (Bobby) Martin in complying with this Court's finding of civil contempt for violating the terms of this Court's Consent Mandatory Injunction and that based upon the greater weight of the evidence, the portion of plaintiff's damages previously assessed in the amount of $616,154.95, are chargeable against the Personal Undertaking and shall not be subject to any claim by the defendants, James F. (Bobby) Martin and Patricia Martin, of any exemption under law including homestead exemption under the laws of the State of Florida.

15. The Court has previously found Pinellas County to be entitled to attorneys' fees for the bringing of a frivolous Counterclaim by the defendants. The Court reserves jurisdiction over its findings and orders in that regard for the purpose of assessment of the amount of attorneys' fees in favor of the plaintiff, Pinellas County.

16. The Court hereby retains jurisdiction over the subject matter of this cause and the parties hereto for the purpose of enforcement of the executory provisions of this Final Judgment and for the purpose of assessment of costs.

17. The Court hereby awards the plaintiffs, Pinellas County, H. George Wilde, and Marjorie E. Wilde, their costs against the defendants, James F. Martin and Patricia Martin, his wife, W. H. Martin and Ruby Martin, his wife, and C. H. Martin and Linda Martin, his wife, to be assessed by the Court at a subsequent proceeding.

DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this 24th day of November, 1986.

Editor's Note: The trial court decision has been appealed to the Second District Court of Appeal and is presently pending in that Court.

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA

CIRCUIT CIVIL NO. 82-13019-17

PINELLAS COUNTY, et al.,

 Plaintiffs,

vs.

JAMES F. MARTIN, et al.,

 Defendants.

_____/

### CONSENT MANDATORY INJUNCTION

THE FOREGOING CAUSE came on to be heard on February 19, 1985, through February 22, 1985, upon plaintiff, PINELLAS COUNTY'S motions against the defendants, JAMES F. MARTIN and PATRICIA MARTIN, entitled "Motion to Require James F. and Patricia Martin to Further Clean Up the Area Known as the 'Bobby Martin Borrow Pit' and Surrounding Lands" and "Motion for Emergency Mandatory Injunction as to Claim Involving Cell IV Against James F. and Patricia Martin," whereupon the Court commenced hearings and taking testimony upon said motions. During the course of the trial on these motions, the plaintiff, PINELLAS COUNTY, and the defendants, JAMES F. MARTIN and PATRICIA MARTIN, came before the Court requesting permission to submit for the Court's consideration a stipulation granting the motions in question. The Court, after having heard the proposed stipulation by the parties and having fully considered the evidence and the environmental concerns of the area and in particular the environmental concerns concerning Pinellas County's Eldridge Wilde Wellfield, with modification provided by the Court, accepted the parties' stipulation in open Court for a resolution of the motions pending between the parties. Therefore, upon stipulation of the parties, it is,

ORDERED AND ADJUDGED that judgment be entered upon the motions brought by the plaintiff, PINELLAS COUNTY, as follows

1. The Court finds that it has jurisdiction of the parties and of the subject matter in this cause and that a proceeding in

**43**

the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, filed by JAMES F. MARTIN and PATRICIA MARTIN, in a Chapter 11 case, Case No. 85-357, it has been determined that the motions for consideration by the Court are not covered by the automatic stay provisions of 11 U.S.C. Section 362, and that an order to such effect was entered by the Honorable Alexander L. Paskay, Chief Bankruptcy Judge, to such effect on February 20, 1985. Therefore, the Court has proceeded to hear the motions raised by PINELLAS COUNTY in this matter.

2. The Court hereby finds that an emergency mandatory injunction should be entered against JAMES F. MARTIN and PATRICIA MARTIN in regard to the motions pending before the Court and that said defendants be ordered to remove the material, sand, trash, and debris, and all further foreign substances from the area known as the "Bobby Martin Borrow Pit," surrounding uplands, and an area described in plaintiff's complaint as "Cell IV" under and pursuant to the terms of this order and judgment according to the area generally outlined in red on the map offered to the Court at the time the stipulation was approved by the Court, in open Court, marked "Plaintiff's Exhibit 4" for identification.

3. The defendants, JAMES F. MARTIN and PATRICIA MARTIN, shall comply with this Court's order by commencing work upon the area known as the "Bobby Martin Borrow Pit" within two weeks from February 22, 1985, and shall complete all work that is required to be done by this order within six (6) months of February 22, 1985. The date upon which all cleanup and removal is to be accomplished may be extended by this Court upon good cause shown provided that the defendants are found by the Court to be acting in good faith to comply with this Court's order and that there are just and reasonable circumstances for such an extension of time. Any motion for extension of time must and shall be filed by the defendants and heard by the Court before the expiration of any period set by the Court under this order.

4. Within two (2) weeks, the defendants, JAMES F. MARTIN and PATRICIA MARTIN, shall commence dewatering the area or borrow

44

 

pit known as the "Bobby Martin Borrow Pit" lying on the edge of the Pinellas County Wellfield. After dewatering, the said defendants shall cause the dirt in the floor of the pit to be excavated completely to a depth of not less than 15 feet from the floor of the existing pit. The material so excavated shall be removed from the cone of depression of defendants' wellfield as further provided in other provisions in this order. For the purpose of this order, the "cone of depression" of the Pinellas County Eldridge Wilde Wellfield shall be determined to be two (2) miles from the edge or periphery of any portion of the wellfield.

5. To the extent possible, with the commencement of excavation work on the "Bobby Martin Borrow Pit," as hereinabove provided, the defendants shall also commence work removing the trash and debris which has been buried in an area as shown on Plaintiff's Exhibit 4 for identification, referred to above, and shall, within the time period provided by this order, cause to be removed from said area the following:

(A) All landfill debris and other foreign substances;

(B) The excavation of a minimum of 15 feet below the bottom surface of the fill in the area known as "Cell IV" as shown on the map, Plaintiff's Exhibit 4 for identification.

6. Within the time period provided by this order, the defendants shall cause to be removed along the upland portion of the area which is the western boundary of the "Bobby Martin Borrow Pit" the land where the spoilage from the Bobby Martin Borrow Pit has previously been stockpiled to a depth of not less than eight (8) feet. This area shall include the areas along both sides of the road which lead from Key Stone Road into the Bobby Martin Borrow Pit. In addition to removal of said soil, the defendants shall further:

(A) Utilize clean fill from the area marked on Plaintiffs' Exhibit 4 as "wooded area" to replace the soil along the road so that the land owned by the owners of the Eldridge Wilde Wellfield will not cave in or be damaged in any fashion;

**45**

(B) The defendants may utilize the eastern side of the existing borrow pit to obtain additional clean fill material for the purpose of replacing the soil excavated along the roadway as described above. The defendants shall properly slope said clean fill material so that the natural terrain of the area shall be maintained and no injury or damage shall occur to the land of the Eldridge Wilde Wellfield.

7. The defendants, JAMES F. MARTIN and PATRICIA MARTIN, shall have the right to stockpile material in the area designated on Exhibit 4 which is the area immediately south of the Bobby Martin Borrow Pit and north of Cell IV. This site may, at defendants' discretion, be the last site upon which removal of soil is to be completed. The defendants shall excavate no less than fifteen (15) feet under the storage area in order to remove any leachate which has occurred. The provisions for core borings and removal of leachate which might occur at a depth greater than fifteen (15) feet under the storage area, as more particularly set out in paragraph 4 herein, shall be followed.

8. The plaintiff, PINELLAS COUNTY, its employees, representatives, attorneys, and consultants shall have the right to monitor all of the activities of the defendants herein and shall be free to have complete access to the lands of the defendants during the time that this order is in effect. Representatives of PINELLAS COUNTY shall be free to document the removal of materials, their storage and ultimate disposal, and shall further be free to take photographs and collect samples for laboratory and chemical analyses, and pursue any other means of monitoring which the plaintiff shall chose. The plaintiff shall also be free to acquire any piece or portion of the foreign material removed from the defendants' property for the purpose of photographing, testing, storage, and preservation. The defendants shall at all times honor this right by the plaintiff, PINELLAS COUNTY, and its representatives, and shall in all instances cease work long enough for the retrieval or removal of any foreign substances desired by the plaintiff. In the event that representatives of PINELLAS COUNTY

46

who are monitoring the removal of the foreigh debris buried on defendants' property shall determine and advise said defendants or their representatives that they believe that hazardous and dangerous materials have been removed or have been uncovered, the defendants agree to cease operations in such area until the hazard is removed satisfactory to both parties. If the parties cannot agree, work in the immediate area of the claimed hazard shall cease and the parties shall immediately appear before the Court on an emergency basis to resolve any differences the parties may have as to the existence of any hazard and if a hazard is found to exist, the proper means of disposal of such hazard.

9. A monthly report commencing on March 1, 1985, shall be filed with the Court with the original being filed in the Court file and a copy being sent to the below named Judge by counsel for the plaintiff, PINELLAS COUNTY, and counsel for the defendants, JAMES F. MARTIN and PATRICIA MARTIN. Such reports shall contain a complete report as to the activities to date, the findings of any materials which have been removed from the borrow pit, the findings of any tests, and the progress being made concerning this Court's order. The Court shall have the power to call upon its own motion, or entertain by motion of any party, any claim that this Court's order is not being strictly complied with.

10. Wherever the term "remove" appears in this order or words to such effect, the term "remove" shall mean that it shall be the sole obligation of the defendants, JAMES F. MARTIN and PATRICIA MARTIN, to remove the material specified by this order from the cone of depression of the Pinellas County Wellfield, as defined, without any obligation on the part of PINELLAS COUNTY to see to such removal or in any way pay for such removal.

11. The Court hereby retains jurisdiction of the parties and of the subject matter of this cause to see to the implementation of its order and to entertain any further hearings required under this order.

12. After all foreign substances are removed from the areas specified in this order, the plaintiff, PINELLAS COUNTY, shall

make appropriate scientific borings into the areas and collect samples for laboratory analysis to determine the extent of any leachate which has occurred underneath the fill material. Such core borings shall, as soon as practicable, be scientifically examined in a laboratory by plaintiff and a full report made to the Court. In the event that core borings indicate that leachate has occurred at a lower depth than that ordered excavated by the Court, then the defendants shall be required to remove said foreign debris, material, and/or dirt to the level underneath the fill material which shall completely remove any leachate found by such core borings.

DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this **27** day of **February**, 1985.

**/s/ FRED L. BRYSON**
CIRCUIT JUDGE

Copies furnished to:

John T. Allen, Jr., Esq.
Michael J. Keane, Esq.
F. Wallace Pope, Jr., Esq.
William F. Garcia, Esq.
Martin L. Garcia, Esq.
Emil C. Marquardt, Jr., Esq.
John A. DeVault, III, Esq.
Robert F. Banker, Esq.

TRUE COPY
Circuit Judge